# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA RAPPAPORT, on behalf of herself and all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **[DEMAND FOR JURY TRIAL]** |
| UNDER ARMOUR, INC., a Maryland corporation, and DOES 1-50, inclusive, | |
| Defendants. | |

Plaintiff Linda Rappaport ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Defendant Under Armour, Inc. ("Under Armour" or "Defendant") and states:

## I.    NATURE OF ACTION

1.    "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Under Armour's fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.      At all relevant times, Defendant has continually advertised false price discounts for merchandise sold throughout its Under Armour Factory outlet stores. In bringing this putative class action Complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme on apparel, accessories, shoes, and other items sold in its Under Armour Factory outlet stores and the outlet portion of its e-commerce website, underarmour.com/en-us/c/outlet/.

4.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.      The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.      The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false referencing pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable, but incorrect, *perceived value* of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased

---

[2] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

willingness to pay $10.00 for the DVD. Thus  the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.      Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, New York and federal law. Specifically, Defendant violated and continues to violate: New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law ("GBL") § 349, *et seq.* (the "NYDAPA"), New York False Advertising Act, N.Y. Gen. Bus. Law § 350, *et seq.* (the "NYFAA"), as well as the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.      Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more of Defendant's Factory outlet items advertised a purported discount from a fictitious higher reference price from Under Armour Factory outlet stores and underarmour.com/en-us/c/outlet/. Plaintiff intends to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable damages, including actual, compensatory, benefit of the bargain, statutory, and punitive; equitable restitution; reasonable costs and attorneys' fees; and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

## II.    JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

10.    The Eastern District of New York has personal jurisdiction over Defendant because Defendant conducts sufficient business with sufficient minimum contacts in this District, and/or otherwise intentionally avail itself of the New York market through the operation of Under Armour Factory stores within the State of New York, including in this District, and because it regularly sells merchandise on its website to New York citizens.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendant's misconduct alleged herein occurred in this District.

## III.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its Under Armour Factory outlet merchandise at its Under Armour Factory outlet stores and e-commerce website, underarmour.com/en-us/c/outlet/.

13.    Retailers like Defendant can and do benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin et al., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the

information available to consumers can vary among different types of products.[3] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[4]

14.    Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Nobel Prize-winning

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. LAW & ECON. 67, 68-69 (1973).

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78, no. 2 J. POL. ECON. 311,  311-12 (1970).

[5] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4, no. 3 MKTG. SCI. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting and Consumer Choice*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 52.

[7] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no 3 J. OF CONSUMER PSYCH. 328 (2003).

economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[8]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher

---

[8] "To incorporate . . . the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting*, *supra* n.6, at 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, 19 no. 1 J. OF CONSUMER RSCH. 62, 68 (1992) [hereinafter Mayhew & Winer, *An Empirical Analysis*].

[10]  Mayhew & Winer, *An Empirical Analysis*, *supra* n.10, at 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* 62 J. OF MKTG. 46, 48 (1998) [hereinafter Grewal et al., *The Effects of Price-Comparison Advertising*].

[12] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting*, *supra* n.6, at 212.

for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

16.    In Staelin, *Regulation of Fictitious Pricing*, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[16] and notes that the findings

---

[13] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*, 18 no.1 J. Pub. Pol'y & Mktg. 3, 7 (1999) [hereinafter Grewal & Compeau, *Pricing and public policy*].

[14] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14, no. 3 Mktg. Sci. G161 (1995); *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. of Applied Bus. Rsch. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[15] Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[16] *See* Staelin et al*., supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.     Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[17] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id*. at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.     Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin *et al*. put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***.") *Id.* at 835 (emphasis added).

**B.     Defendant Engages in a Fraudulent Price Discounting Scheme.**

19.     Defendant is a specialty retailer of athletic apparel. For years, Defendant has engaged in a fake discounting scheme that harms consumers by advertising its outlet merchandise at discounted "sale" prices in its outlet stores and on the outlet portion of its e-commerce website,

---

[17] Staelin et al., *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

underarmour.com/en-us/c/outlet/. In short, Defendant markets its outlet merchandise with the "sale" prices as discounts from its "original" prices listed on the products' price tags in both its outlet brick-and-mortar and e-commerce stores. In most in-store cases, the items are each accompanied by a placard sign immediately above them[18] advertising a "__% Off" In other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price. The discount placard signs are printed on black and red card stock with bold, white lettering advertising the fake discount. Defendant does *not* advertise or otherwise disclose the date on which any item was last offered for its "original" price.

20.     The photos below demonstrate Defendant's uniform storewide practice in place at all Under Armour Factory stores.[19]

 

---

[18] In other cases, such as with table displays, the discount sign applies to several, typically similar, items.

[19] *See* **Exhibit A**, additional Under Armour Factory in-store photographs depicting the extent and pervasiveness of Defendant's discounting scheme.

 

21.    As shown in the above photos Defendant's "original" (or "MSRP") prices are unaccompanied by any qualifying language directing consumers to compare Defendant's reference prices and purported discounts to any other outside market (such as the oft-used "compare at" or "comparable value" reference price qualifiers).[20] And with good reason: all, or virtually all, of the merchandise sold at Under Armour Factory outlet stores is manufactured for and sold exclusively at Under Armour Factory stores. *See* Under Armour, Inc., Annual Report (Form 10-K), at p. 4

---

[20] In those schemes an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Accordingly, Plaintiff is *not* required to "'assert evidence from which a rational trier of fact could infer that the **comparative** reference price was inaccurate[,]'" *Harris v. PFI W. Stores Inc.*, No. SACV192521JVSADSX, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling*, 291 F. Supp. 3d at 1085-86) (emphasis added), because, "th[at] situation **only arises when the language of the advertisement implies a comparison to another retailer**. *Id.* (citing *Horosny v. Burlington Coat Factory of California, LLC*, No. CV1505005SJOMRWX, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added).

(May 24, 2023) ("Factory House store products are specifically designed for sale in our Factory House stores").[21]

22.     The reasonable impression that Defendant's reference prices denote limited-time discounts from *former* prices are reinforced by Defendant's pervasive use of "__% OFF" advertisements, as well as Defendant's explicit reference to the price tag prices as the "original price" on consumers' receipts, along with the purported percent-off discount and "you saved" amount.[22] Additionally, as discussed below, Defendant's reference pricing scheme on its Factory outlet website employs unqualified reference prices, likewise indicating a reduction from a former price. Thus, Defendant does not advertise any "discounts" from any other stores, including its own mainline Under Armour stores.

23.     The "MSRP" qualifier accompanying Defendant's in-store reference prices on its *exclusive* (and any fractional non-exclusive) Factory store items, is not a comparison to another market, such as with "compare at" qualifiers. To the extent Defendant's Factory store advertised discounts can be characterized as "suggested retail prices," or "MSRPs," Defendant's advertised reference price and discounting scheme also violates 16 C.F.R. § 233.3, which pertains to

---

[21] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *see, e.g.*, *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015).

[22] *See Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

"advertis[ements] [of] retail prices which have been established or suggested by manufacturers." This is because 16 C.F.R. § 233.3(a) provides that "[t]o the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of *the article in question* are made, the advertisement of a reduction may mislead the consumer." (emphasis added). Here, the items sold in Defendant's Under Armour Factory outlet stores are *never* sold there, or anywhere, at the "list or suggested retail prices"—and certainly not at a "substantial number of sales." Moreover, as the manufacturer and exclusive retailer of most, if not all, of the Factory outlet merchandise, Defendant knows, or certainly should know, that substantial sales at these reference prices are not occurring. *See* 16 C.F.R. § 233.3(d) ("[I]f the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price."). At the very least, the resolution of these issues raises a reasonable question of fact.

24.    With respect to Defendant's Factory outlet sales at underarmour.com/en-us/c/outlet/, Defendant engages in the online equivalent of its brick-and-mortar practice, if not a more egregious practice. That is, Defendant perpetually advertises Under Armour Factory merchandise with an "original" price (in grey or red font) with a strikethrough on it (i.e., crossed out: e.g., $35.00) next to a corresponding "Sale" price (e.g., "$17.50"), which represents a whole-price "discount" from the struck-through (fictitious) "original" price. The "sales" price appears in slightly darker black font. Like Defendant's in-store Under Armour Factory products, the false reference prices advertised at underarmour.com/en-us/c/outlet/ operate as a baseline for consumers to rely on to assess a product's value. Defendant's strikethrough reference price/sales price scheme here reasonably communicates to consumers that the product is being offered at a substantial discount from a former price for a limited time and will return to that price if the shopper fails to

13

act. The photos below illustrate this practice, which is uniform across the e-commerce website, and is employed on both list and product pages.[23]



---

[23] Attached hereto as **Exhibit B** are numerous snapshots from underarmour.com/en-us/c/outlet/ showing an assortment of merchandise items advertised with false discounts. Attached as **Exhibit C** are numerous snapshots of the website acquired from the Wayback Machine ("WBM"). WBM (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, WBM permits users to view it exactly as it appears on the date the page snapshot is taken. The date of the snapshot is shown at the top of each page. **Exhibit C** therefore offers further evidence of the perpetual nature of Defendant's false discounting scheme employed at its e-commerce store at underarmour.com/en-us/c/outlet/.

25.    Additionally, the Under Armour Factory products sold in-store and at underarmour.com/en-us/c/outlet/ are the same. There is also no meaningful difference from Defendant's Under Armour Factory inventory—the same products are sold at every store and online and the same fraudulent pricing scheme is deployed uniformly across both sales channels. The only difference is the in-store reference prices are accompanied by the misleading MSRP qualifier while the online items are not. Both channels consist virtually entirely of exclusive, made-for-outlet products not sold in Under Armour mainline stores or department stores.

26.    And even if Defendant did offer the Factory outlet products at their full reference price (it does not), that offering would not legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public *on a regular basis for a reasonably substantial period of time*." 16 C.F.R. § 233.1(a) (emphasis added). Rather, the advertised reference prices on Under Armour Factory merchandise are *not* the price at which Defendant regularly (or ever) sells, or expects to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

27.    In sum, Defendant's fake discount scheme is intended to (and does) increase Defendant's sales while depriving consumers of the benefit of their bargain and causing them to spend more money than the Factory outlet store items are actually worth—the price they could command in the absence of the fake discount. The Under Armour Factory products sold in both the brick-and-mortar Under Armour Factory stores and underarmour.com/en-us/c/outlet/ are never—or virtually never—offered for sale or actually sold at their "original" or "price tag" prices. The reference prices and accompanying "discounts" are therefore fraudulent and used solely to induce consumers to make purchases and spend more under the reasonable, but incorrect, belief

that the merchandise was once sold at its advertised reference price in either (1) the brick-and-mortar Under Armour store, (2) underarmour.com/en-us/c/outlet/, or (2) the Under Armour mainline store (which sells higher quality Under Armour-branded merchandise) at a significant discount when, in fact, they are purchasing inferior quality, *made-for-factory-outlet*, merchandise that has never been offered outside of an Under Armour Factory store and, even there, never (or virtually never) at the higher "original" price advertised on its price tag. Such misconduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information and results in the illegal imposition of a price premium the Factory store merchandise could not and would not otherwise command, which consumers, like Plaintiff, are duped into paying.

## C. Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

28.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[24] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[25] Consumers are misled and incorrectly overvalue Defendant's Factory products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

---

[24]  Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[25]  Gotlieb & Fitzgerald, *An Investigation*, *supra* n.15, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

[A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[26]

29.     Accordingly, all consumers who purchase Under Armour Factory merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Under Armour Factory merchandise. This is because, again, the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *supra*, at 835. Thus, all Under Armour Factory shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's Under Armour Factory merchandise. All consumers who purchase falsely discounted Under Armour Factory outlet products have overpaid are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

30.     To put it differently, the fake discount information presented by Defendant's falsely advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer

---

[26]Dhruv Grewal et al., *The Effects of Price-Comparison Advertising*, *supra* n.12, at 46.

perception results in these consumers gaining an additional "transaction value"[27] on their outlet purchases, which they would not have otherwise gained but for Defendant's fake discounting scheme. Consumers' valuation of Under Armour Factory outlet merchandise therefore increases in the aggregate.

31.     Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived Factory outlet shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[28] The aggregate demand curve for a product, including Defendant's, represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

32.     As a result, Defendant's pricing scheme impacts the market prices of its Under Armour Factory outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Under Armour Factory outlet prices. Economic theory ensures that as the aggregate demand

---

[27] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'"); Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[28] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis*. 3rd Edition. New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class (defined below) members thus suffered a common impact from Defendant's misconduct.

**D.    Investigation**

33.    Plaintiff's counsel has conducted a large-scale, comprehensive investigation into Defendant's fake discounting scheme at its Under Armour Factory outlet stores and online at underarmour.com/en-us/c/outlet/. Plaintiff's counsel has tracked items in Defendant's Under Armour Factory stores in Oregon, California, and New York. The initial investigation occurred in California, beginning February 7, 2022, and continuing—often on a daily or near-daily basis—until September 23, 2022. Plaintiff's counsel made additional visits from May to August 2024 to confirm that Defendant's Under Armour Factory items remained falsely discounted under the same pricing scheme and confirmed that they did. In September 2023, Plaintiff's counsel began its Oregon investigation, which is currently ongoing. Plaintiff's counsel has also monitored Defendant's pricing in New York. Notably, at all times (2022, 2023, and 2024), all products observed remained "discounted" under the same uniform pricing scheme[29] at all locations regardless of the state and year, and all products observed remained perpetually "discounted." Attached as **Exhibit E** to this complaint is a list of exemplary products tracked. The only thing that changed was the advertised discount and/or reference price on certain merchandise. In other words, the items had price tags that were constantly "discounted" by in-store signage indicating a substantial percent off ("__% Off") or whole-price reduction discount.

34.    Thus, the investigation confirms that the "original" or "price tag" reference price of the item Plaintiff purchased was never the actual selling prices of that item because it was never

---

[29] I.e., the manner in which the reference prices and purported discounts are conveyed to shoppers. *See* **Exhibit A**.

offered at that price, but rather, consistently with Defendant's uniform scheme, continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive, uniform, and systematic practice at Defendant's Under Armour Factory stores, as thousands of items remained continuously discounted throughout the investigation period, including the product purchased by Plaintiff.[30] Indeed, the investigation indicated that Under Armour Factory merchandise is never offered for sale at its full "original" price—and certainly are not "on a regular

---

[30] Numerous false discount pricing cases brought in California federal courts have held that, notwithstanding Rule 9(b), that Plaintiff is **not** required to perform or provide **any** specific details pertaining of pre-lawsuit investigations into false discounting practices in order to defeat a motion to dismiss. *See, e.g.*, *Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures … Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (false pricing complaint lacking any allegations of pre-suit investigation satisfied Rule 9(b); *Knapp*, 2016 WL 3268995, at *4 (allegations of "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (motion denied where plaintiff pled only "on information and belief," and without investigation, the existence of a deceptive pricing scheme).

**Notably**, GBL claims are not subject to Rule 9(b), and thus not the oft recognized in California pre-suit investigation requirement. *See Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 239 (S.D.N.Y. 2015). Instead, the GBL provides a cause of action for any person injured by "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing or any service." N.Y. Gen. Bus. Law § 349(a), (h).

**Still**, California federal and state courts have routinely sustained complaints with allegations of pre-suit investigation similar to Plaintiff's here over challenge. *See, e.g.*, *Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris v. PFI W. Stores, Inc.*, No. SACV 19-2521 JVS (ADSx), 2020 WL 3965022, at *1 (C.D. Cal. Apr. 9, 2020); *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint); *Schertzer v. Alpargatas USA Inc* (Super. Ct. San Diego, 37-2019- 00015352, Dkt. No 45).

basis for a reasonably substantial period of time," as required by the FCTA. *See* 16 C.F.R. § 233.1 ("[T]he former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time"); 16 C.F.R. § 233.3 ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.")

35.    Plaintiff's counsel has also monitored Under Armour Factory outlet merchandise sold online at underarmour.com/en-us/c/outlet/ during 2024. Plaintiff is informed and believes and thereon alleges that underarmour.com/en-us/c/outlet/ sells the same Under Armour Factory merchandise (i.e., same quality, materials, manufacturing process, etc.) as the brick-and-mortar Factory outlet stores in New York. Plaintiff's counsel found that the merchandise for sale on underarmour.com/en-us/c/outlet/ was subject to the same perpetual false discounting scheme. Indeed, everything offered on underarmour.com/en-us/c/outlet/ appears to be always, if not virtually always, advertised at discounts from higher reference prices. This confirmed allegations in Section III.B. above—that items for sale on underarmour.com/en-us/c/outlet/ are perpetually and uniformly priced with substantially "discounted" sale prices appearing next to both the "crossed out" (or "strikethrough") "original" price, next to the lower "sale" price. Attached hereto as **Exhibit D** is a summary of product tracking data collected by Plaintiff's counsel during 2024.

36.    Plaintiff's counsel also researched underarmour.com/en-us/c/outlet/ with the WBM. The website snapshots recorded by the WBM are consistent with the investigation. *See* **Exhibit C**. The website snapshots recorded by the WBM showed discounted prices on underarmour.com/en-us/c/outlet/ merchandise across several months before Plaintiff's purchases.

37.     Thus, the false discounting scheme used by Defendant on its Under Armour Factory merchandise is uniformly and identically applied on all, or virtually all, of the Under Armour Factory products sold through Defendant's New York brick-and-mortar outlet stores and e-commerce website, underarmour.com/en-us/c/outlet/.

38.     Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## IV.     PARTIES

### Plaintiff Linda Rappaport

39.     Plaintiff resides in Merrick, New York. On April 28, 2024, Plaintiff went shopping for some new clothing at the Under Armour Factory outlet store at the Tanger Outlets located at 152 The Arches Circle, Suite 425, Deer Park, New York 11729 ("Tanger Outlets"). In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff purchased a Women's Mid Crossback Printed Sports Bra. The item's price tag bore an advertised "original" price of $34.97 and there was prominently displayed "TAKE AN ADDITIONAL 50% OFF" sign above it on the rack. This "discount" brought the selling price of the item down to approximately $17.48.

40.     During her time at the Under Armour Factory outlet store at the Tanger Outlets on April 28, 2024, Plaintiff browsed several items before deciding on what to purchase. After reviewing the advertised sale price for the Mid Crossback Printed Sports Bra described above, Plaintiff decided to purchase the item. During her time there on April 28, 2024, Plaintiff also noticed numerous signs advertising various "__% Off" discounts on items throughout the store.

41.     Indeed, after observing the original prices of the item and the accompanying sale price, Plaintiff believed she was receiving a significant discount on the item she had chosen. Her belief that the discounted prices on the item was limited and would not last was material and integral to her purchase decision. She would not have made the purchase were it not for the significant bargain she thought she was receiving. Indeed, the advertised discount was a material representation to her and she relied on it in making her purchase decision. However, the advertised discount was fake and Plaintiff did not receive the benefit of the bargain. In reality, Defendant was able to charge more for the item as a result of the fake discount scheme than it would have in its absence.

42.     Plaintiff has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff's Economic Injury Is Readily Quantifiable**

43.     Plaintiff has been injured and incurred quantifiable actual damages as a result of Defendant's fraudulent pricing scheme, which can be and has been preliminarily calculated through the use of regression analysis.

44.     Plaintiff overpaid for the product she purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original belief that the product she purchased was discounted and, thus, that its value was significantly greater than the sale price for which she purchased it, Plaintiff, in actuality, paid an *inflated* price for the supposedly discounted product she purchased. In other words, both the reference price and the actual selling price of the item Plaintiff purchased were inflated, but for different reasons: the reference price because Defendant intentionally fabricated it and the actual selling price because if Defendant had not engaged in the false discounting

scheme, then that item would not have commanded such a high, i.e., *inflated*, price. Thus, the item Plaintiff purchased was worth less than the amount she paid for it.

45.    Plaintiff was damaged in her purchase because Defendant's false reference price discounting scheme inflated the final selling price of the item she purchased, such that Defendant's false reference price discounting scheme caused Plaintiff to pay a price premium. Defendant's false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendant not engaged in a false reference pricing scheme. Plaintiff would not have purchased the merchandise, or would have paid less for it, but for Defendant's representations regarding the false reference price and purported discount of the merchandise. Plaintiff was misled into believing that she was receiving substantial savings on the purchase of Defendant's product, which was implied by the falsely advertised reference price.

46.    Here, for purposes of investigation and determining a preliminary measure of injury (i.e., damages), Plaintiff, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendant's product SKUs and pricing practices attached to each SKU. Plaintiff, through the use of sophisticated regression analysis, was able to determine the objective measure by which Plaintiff and Class members overpaid for the goods they purchased.[31]

---

[31] Notably, if the "misrepresentation ... artificially inflate[s] the market price of a product, causing [Plaintiff] to pay more for it than [she] otherwise would have—regardless of whether [she] even saw the misrepresentation," the plaintiff was "harmed [ ] by a misrepresentation without necessarily having relied on it." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *10 (S.D.N.Y. Aug. 13, 2020). Under this "theory of causation … that the advertising and labeling practice allowed a price premium to be charged" is often known as a "market-price-based theory of causation." *Id.* at *11 (citation and internal quotation marks omitted). This theory, "unlike the promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

47.     Reference guides on regression-based damages describe how "[p]ractitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the causal link … Regression analysis applies a statistical technique to develop an equation depicting the relation among variables and then uses that equation for prediction."[32] In this case, Plaintiff's consultants utilized regression analysis to estimate the relationship between Defendant's reference prices and Defendant's selling prices, after accounting for the other factors that influence Defendant's pricing, and used that equation to predict prices that would have occurred but for misconduct in this case. As explained below, the regression analysis relies on Defendant's data and measures how selling prices increase when the intensity of its misconduct is greater (i.e. a higher reference price leads to higher selling price, holding all else equal).

48.     Plaintiff's experts used the data collected during the investigation to analyze 86 products offered for sale within Defendant's Under Armour Factory stores during the Class Period (defined below). The average actual sales price within this data sample was $27.63, whereas the average reference price was $55.12. Thus, on average, the reference price chosen by Defendant was $27.48 higher (or 99.5% higher) than the selling price.

49.     Plaintiff's experts used this data as input (among additional control variables affecting price, described below) to perform a regression model which allowed them to calculate the price premium paid by Plaintiff, and all similarly situated proposed Class members, for each product purchased. The regression model incorporates supply and demand factors through the use of *actual selling prices*, which are the net result of the competitive factors that influence Defendant's pricing. For example, the price of an item at issue in this case is a function of its

---

[32] Roman L. Weil et al., *Litigation Services handbook: the role of the Financial Expert* Ch. 4, p. 25 (6th ed. 2017).

component features (e.g., is the item a shirt or jacket? Is the item marketed towards women or men?). The net effect of the demand factors (e.g., consumer willingness to pay for an item based on its features) and supply factors (e.g., Defendant's production costs) are captured within the product's attributes when actual selling prices are used in this type of regression analysis.

50.    While additional variables will be accounted for after more detailed data is provided by Defendant or elsewhere during discovery, this initial regression analysis already accounts for six (6) variables that impact Defendant's pricing (including reference price). For example, the regression analysis accounts for broad product type (e.g., bottoms vs. tops vs. outerwear) and target demographic (e.g., men's vs women's). After accounting for these product characteristics, the regression finds that increasing the reference price by $1 results in an increase of approximately $0.50 in the selling price of items at Under Armour Factory stores.

51.    The corresponding regression equation is then used to predict selling prices if the reference price was reduced to the typical selling price of the item (i.e., lowering the reference price to remove the impact of the pricing misconduct). For example, as previously discussed, the preliminary data suggests that Defendant's Under Armour Factory store reference prices were $27.48 (or 99.5% higher) than the actual sales prices, on average. When combined with the preliminary regression results described above, this $27.48 differential implies that selling prices were approximately $13.74 higher, on average, due to the false discounting scheme alleged in this case.[33] This average overcharge of $13.74 represents approximately 49.7% of the average actual sales price ($27.63) within the data collected by Plaintiff.[34]

---

[33] That is, $27.48 x .5 = $13.74.

[34] That is, $13.74 / $27.63 = 49.7%

52.     These results will be revised somewhat once Plaintiff receives additional pricing data (i.e., daily histories of reference and sale prices for many more SKUs during the Class Period), but even the data collected by Plaintiff's counsel demonstrates that Plaintiff and others similarly situated paid a price premium as a direct result of the false discounting scheme practiced universally at Under Armour Factory stores. Plaintiff will seek in-depth discovery of internal documents, digitally stored historic pricing data, and depositions of persons most knowledgeable about Defendant's practices to supplement this investigation, show common injury at class certification, and prove damages with reasonable certainty at trial.

53.     The harm to Plaintiff and Class members (i.e., price premium) caused by Defendant's misconduct can also be objectively measured through the use of conjoint analysis supported by Defendant's historic pricing, sales, and other market data, which will also be pursued vigorously in discovery, to isolate the price premium associated with Defendant's false reference price and discounting scheme.

54.     Conjoint analysis is a well-accepted survey-based technique in which survey participants select their most preferred product from a series of product options with different attributes (including price).[35] The researcher will then analyze consumers' trade-offs among products with different features using a statistical model that allows the researcher to estimate the influence of each product attribute and the willingness-to-pay ("WTP") for a particular product attribute. In other words, conjoint analysis can establish the extent to which consumer preferences

---

[35] "The key characteristic of conjoint analysis is that respondents evaluate product profiles composed of multiple conjoined elements (attributes or features). Based on how respondents evaluate the combined elements (the product concepts), we deduce the preference scores that they might have assigned to individual components of the product that would have resulted in those overall evaluations" (Orme, B. "A Short History of Conjoint Analysis." Chapter 4 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Second Edition, Madison, WI: Research Publishers LLC, 2010, p. 29).

(i.e., consumer demand, or WTP) change due to the alleged misconduct (i.e., false reference and discounting scheme) and, further, quantify its monetary impact on actual selling prices. After measuring the change in consumer preferences (and WTP) due to the alleged misconduct in this case, an overcharge is calculated by then incorporating *supply*-side behavior.

55.    As with hedonic regression, Plaintiff can put forth an expert-based conjoint analysis with and/or without an economic market simulation to account for supply side factors[36] that will likewise demonstrate the price premium paid on products with inflated reference prices as compared to those without inflated reference prices. This approach will isolate the economic harm to Class members due solely to Defendant's misconduct and will demonstrate that otherwise identical products sold *without* reference prices ultimately cost less.

---

[36] An economic market simulation estimates market prices by fully incorporating the relevant supply and demand information to estimate the but-for market prices that would have been paid by consumers in the absence of the alleged misconduct. It is used to incorporate supply side factors into the but-for world in which consumers' WTP has adjusted due to the absence of the alleged misconduct. Market simulations often incorporate (and are calibrated to) real-world supply and demand market data on the Defendant's (and competitor's) products, prices, costs, market share, consumer decisions (*e.g.*, mixed logit coefficients from conjoint analysis), and the price elasticity of consumer demand. Indeed, a wide body of academic literature in the economics discipline describes combining the consumer demand side of the market with the supply side of the market to determine market equilibrium prices. For example, Steven Berry, et al., Automobile Prices in Market Equilibrium, 63 *Econometrica* 841 (1995); Aviv Nevo, A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, 9 *Journal of Economic and Management Strategy* 513-548 (2000); Steven Berry, et al., Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market, 112 *Journal of Political Economy* 68-105 (2004); Petrin, Amil, Quantifying the Benefits of New Products: The Case of the Minivan, 110 *Journal of Political Economy* 705–729 (2002); Greg Allenby, et al., Valuation of Patented Product Features, 57 *The Journal of Law & Economics* 629-663 (2014). Within the context of consumer class action litigation, various courts have accepted damages models based on economic market simulations that incorporate the findings of a conjoint analysis with additional supply-side factors. *See, e.g., Wesley Won et al. v. General Motors*, *LLC*, No. 2:19-cv-11044 (DML) (DRG) (E.D. Mich., July 28, 2022); *Thomas Allegra et al. v. Luxottica Retail North America, d/b/a Lenscrafters*, No. 17 CV-5216 (PKC) (RLM) (E.D.N.Y., Dec. 13, 2021); *Riley Johannessohn, et al. v. Polaris Industries*, *Inc*., No. 16-cv-03348 (NEB/LIB) (D. Minn., Mar. 31, 2020) ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world").

56.    Accordingly, objective measures demonstrate that Plaintiff overpaid for the Under Armour Factory store merchandise she purchased. The difference between the actual sales price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendant's false discounting scheme—and the market sale price that the products would have commanded without Defendant's misconduct provides an objective measure by which Plaintiff was overcharged and injured by Defendant. The amount of inflation of the prices for the Under Armour Factory store merchandise Plaintiff purchased caused by Defendant's deception thus measures how much Plaintiff overpaid. As shown above, this amount can be quantified using regression analysis based on Defendant's historic pricing data and/or through conjoint analysis (with or without a market simulation). Plaintiff's allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 (1999). *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase") (emphasis added).

## Plaintiff Has Standing for Injunctive Relief and Lack an Adequate Remedy at Law

57.    Plaintiff is also susceptible to harm reoccurring, and therefore require an injunction, because she cannot be certain that Defendant will have corrected this deceptive pricing scheme, and she plans to return to the Tanger Outlets in the future and, once there, would like to shop at Defendant's Under Armour Factory stores again because she likes the brand and the clothing styles offered. But due to the enormous, fluctuating variety of styles and sizes offered, she will be unable to parse what prices are inflated and untrue, and what prices, if any, are not. In short, Plaintiff simply does not have the resources to ensure that Defendant is complying with New York law and

federal regulations law with respect to Defendant's pricing, labeling, and advertising of its Under Armour Factory outlet merchandise.

58.     Further, because of the wide selection of merchandise available at Defendant's Under Armour Factory outlet stores, the sheer volume of Under Armour Factory products involved in Defendant's deceit (i.e., virtually all of them), and the likelihood that Defendant may yet develop and market additional Under Armour Factory merchandise items for sale, Plaintiff may again, by mistake, purchase a falsely discounted product at one of the Under Armour Factory stores under the reasonable, but false, impression that Defendant had corrected the scheme and that its reference price advertisement represented a *bona fide* former price at which the item was previously offered for sale by Defendant. However, without a substantial, time-consuming, and costly investigation, Plaintiff will have no way of knowing whether Defendant has deceived her again.

59.     Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the general public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee them the appropriate assurances

**<u>Defendant</u>**

60.     Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Under Armour, Inc. is a Maryland corporation with its principal executive offices in Baltimore, Maryland. Plaintiff is informed and believes that Defendant Under Armour owns and

operates Under Armour Factory outlet stores in New York and advertises, markets, distributes, and/or sells clothing and accessories in New York and throughout the United States.

61.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

62.    Defendant knows that its reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under New York and federal law.

63.    Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices and former reference prices. Defendant concealed from consumers the true nature and quality of the products sold at its Under Armour Factory outlet stores.

64.    Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Under Armour Factory outlet products in its stores.

65.    At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

## V.    CLASS ALLEGATIONS

66.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant:

> All persons who, within the State of New York and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Under Armour Factory store (in-person or online) one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more classes, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

67.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

68.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether, during the Class Period, Defendant used falsely advertised reference prices on its Under Armour Factory outlet product labels and falsely advertised price discounts on merchandise sold in its Factory outlet stores and website;

      b.      whether Defendant ever offered items for sale or sold items at their advertised reference price;

      c.      whether Defendant's advertised sale prices in its Under Armour Factory stores reflect any actual discounts or savings;

      d.      whether Defendant's purported sale prices advertised in its Under Armour Factory outlet stores reflected any actual discounts or savings;

      e.      whether Defendant's purported percentage-off discounts advertised in its Under Armour Factory outlet stores reflect any actual discounts or savings;

      f.      whether Defendant's alleged conduct constitutes violations of the laws asserted;

      g.      whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

      h.      whether Plaintiff and Class members are entitled to restitution and/or damages, and the proper measure of restitution and/or damages; and

      i.      whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparisons.

69.    ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

70.    ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation,

and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

71.    **Superiority**: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

72.    All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to New York consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at Under Armour Factory outlet stores.

73.    Plaintiff is informed that Defendant keeps extensive computerized records of its Under Armour Factory outlet customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one or more databases through which

a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.    CAUSES OF ACTION

### **FIRST CAUSE OF ACTION**

**Violation of the New York Consumer Protection From Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. Gen. Bus. Law § 349, *et seq.***

74.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

75.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of NYDAPA, N.Y. Gen. Bus. Law § 349.

76.    NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

77.    Plaintiff and members of the proposed Class are "persons" under NYDAPA, N.Y. Gen. Bus. Law § 349(h), and Defendant's actions as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

78.    In the course of its business, Defendant advertised false reference prices that gave consumers, including Plaintiff and members of the proposed Class, the impression that its products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's Under Armour Factory stores were worth more than they actually were.

79.    Plaintiff and members of the proposed Class had no way of discerning that Defendant's representations were false and misleading.

80.     Defendant thus violated, and continues to violate, NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, give the false impression that the products sold at Defendant's Under Armour Factory stores are worth more than they actually are.

81.     Defendant knew, or should have known, that its conduct violated NYDAPA and owed a duty to Plaintiff and members of the proposed Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about its false discounts.

82.     Defendant intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of its apparel, accessories, shoes, and other Under Armour Factory products with intent to mislead Plaintiff and members of the proposed Class.

83.     Defendant's misleading and false advertisements were material to Plaintiff and members of the proposed Class, as they relate to the price of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

84.     Defendant's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and members of the proposed Class, about the price of its apparel and other Under Armour Factory products. Plaintiff and members of the proposed Class reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the apparel, accessories, shoes, and/or other items from Defendant's Under Armour Factory stores. Plaintiff and members of the proposed Class would not have made such purchases but for Defendant's representations regarding the substantial discount being offered for the products.

85.    Defendant's violation of NYDAPA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff, members of the proposed Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff and members of the proposed Class.

86.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's businesses, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

87.    Plaintiff and members of the proposed Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including, but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SECOND CAUSE OF ACTION

### Violation of the New York False Advertising Law ("NYFAA")
### N.Y. Gen. Bus. Law § 350, *et seq.*

88.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

89.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of NYFAA, N.Y. Gen. Bus. Law § 350.

90.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into

account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350(a).

91.     Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's Under Armour Factory stores were worth more than they actually were.

92.     Defendant intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of its apparel, accessories, shoes, and other Under Armour Factory products with intent to mislead Plaintiff and members of the proposed Class.

93.     Defendant's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and members of the proposed Class, about the price of its apparel, accessories, shoes, and other Under Armour Factory products. Plaintiff and members of the proposed Class reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the apparel, accessories, shoes, and/or other products from Defendant's Under Armour Factory stores. Plaintiff and members of the proposed Class would not have made such purchases but for Defendant's representations regarding the substantial discount being offered for the product.

94.     Defendant's violation of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff, members of the

proposed Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff and members of the proposed Class.

95.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's businesses, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

96.    Plaintiff and members of the proposed Class are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including, but not limited to, injunctive relief, recovery of actual damages and/or five hundred dollars per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

1.    an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

2.    awarding actual, punitive and statutory damages as permitted under the NYFAA and the NYDAPA;

3.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

4.    awarding declaratory and injunctive relief as permitted by law or equity, including an order enjoining Defendant from continuing the unlawful practices as set forth herein and retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

5.    ordering Defendant to engage in a corrective advertising campaign;

6.    awarding attorneys' fees and costs; and

7.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: October 29, 2024

**LYNCH CARPENTER, LLP**

By:   _/s/ Gary F. Lynch_
Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    (412) 322-9243

**LYNCH CARPENTER LLP**
Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Scott G. Braden (*pro hac vice* forthcoming)
scott@lcllp.com
Matt J. Zevin (*pro hac vice* forthcoming)
mattz@lcllp.com
1234 Camino Del Ma r
Del Mar, California 92014
Telephone:    (619) 762-1910
Facsimile:    (858) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*